# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HEATHER HECKMAN, | : | CASE NO. 3:12-cv-02187-GBC |
| | : | |
| Plaintiff, | : | (MAGISTRATE JUDGE COHN) |
| | : | |
| v. | : | MEMORANDUM TO DENY PLAINTIFF'S |
| | : | APPEAL |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | Docs. 8,11,12,15 |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM TO DENY PLAINTIFF'S APPEAL

### I. Procedural History

On November 23, 2009, Heather Heckman ("Plaintiff") protectively filed an application for Title II Social Security Disability benefits ("DIB"), with an onset date of May 7, 2009. (Tr. 120).

This application was denied, and on April 1, 2011, a hearing was held before an Administrative Law Judge ("ALJ"), where Plaintiff appeared with counsel and testified, as did a vocational expert (Tr. 30-81). On April 12, 2011, the ALJ issued a decision finding that Plaintiff was not entitled to DIB because Plaintiff could perform a range of unskilled, sedentary work that allowed

for a sit / stand option (Tr. 19). On August 29, 2012, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 2).

On November 2, 2012, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. Doc. 1. On December 20, 2012, Commissioner filed an answer and administrative transcript of proceedings. Docs. 7,8. In February and March 2013, the parties filed briefs in support. Docs. 11,12. On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. On May 13, 2014, the Court issued an order providing Plaintiff the opportunity to file a reply brief and notifying the parties of the option to consent to Magistrate Judge jurisdiction. Doc. 13. On May 22, 2014, the parties consented to Magistrate Judge jurisdiction, and Plaintiff filed a reply brief in accordance with the Court's order. Docs. 14,15.

## II.    Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Commissioner of Social Sec., 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 564 (1988); Hartranft v. Apfel, 181 F.3d 358, 360. (3d Cir. 1999); Johnson, 529 F.3d at 200.

This is a deferential standard of review. See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence is satisfied without a large quantity of evidence; it requires only "more than a mere scintilla" of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). It may be

less than a preponderance. Jones, 364 F.3d at 503. Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).

To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).

Moreover, the Act requires further that a claimant for disability benefits must show that he has a physical or mental impairment of such a severity that: "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

### III. Relevant Facts in the Record

### A. Background

Plaintiff is a forty year old female who was thirty-six years old at the time of her application, which is classified as a younger individual (20 C.F.R. § 404.1563) (Tr. 189). Plaintiff has a high school education (Tr. 24) and past relevant work at the substantial gainful activity level of a Cashier Checker and a Medical Records Technician (Tr. 65), and at the non-substantial gainful activity level

as a Receptionist, Secretary and Unit Clerk (Tr. 66).

The Plaintiff testified to having pain in her tailbone, back, hips and knee (Tr. 54). The Plaintiff had an MRI (Tr. 99) of her right knee September 24, 2010 which showed a small effusion as well as being tender to palpitation by Dr. Oplinger, an orthopedic surgeon (Tr. 89). On May 7, 2009, the alleged onset day, the Plaintiff was at Chambersburg Hospital because her right knee had popped (Tr. 376). In June of 2009 she stated at Chambersburg Hospital that she had tripped over her dog and was diagnosed with an acute right knee sprain (Tr. 374). She was treated at the Sadler Clinic in January of 2010, even though she had no insurance, for morbid obesity, gastrointestinal reflux disease, chronic arthralgia, swelling and stiffness as well as the mental issues stated above (Tr. 431). Plaintiff again went to Chambersburg Hospital on June 13, 2010 with acute leg swelling, acute peripheral edema, hypomagnesemia, and anemia (Tr. 473). The Sadler Clinic saw Plaintiff on February 24, 2010, and noted she had multiple somatic problems as well as being grossly overweight and possibly having fibromyalgia. A consulting physical exam done by Dr. Wampler (Tr. 434) on February 18, 2010 resulted in a diagnosis of obesity, musculoskeletal problems, and rheumatoid arthritis with a marked decrease in range of motion of her shoulders (Tr. 438). He felt Plaintiff could lift 10 pounds, sit 1-2 hours in an 8 hour workday, with no limit on sitting but would need to change position as needed and could never bend, kneel, stoop, balance, crouch, or climb. He opined her reaching was affected and she should avoid poor ventilation, heights, moving machinery, vibrations, dust, fumes, odors, gases and humidity.

In the decision, the ALJ accepted that Plaintiff had the severe impairments of obesity, arthritis, bipolar disorder, asthma, hypertension, depression, anxiety, gastroesophageal reflux disease, sleep apnea, and status post carpal tunnel release (Tr. 15).

## B. Relevant Medical Evidence

### 1. Medical Evidence Related to Plaintiff's Physical Impairments[1]

Plaintiff alleged that she was fired from her job on May 7, 2009 – her alleged onset of disability – because she had to go to the hospital (Tr. 189, 204, 449-50). Records from the Chambersburg emergency department that day reflect that while Plaintiff complained of right knee pain, she appeared "quite comfortable" (Tr. 376). She had no knee deformity, no effusion, intact pulses and sensation, and could bend and flex her knee (Tr. 376). Her knee was stable and x-rays were unremarkable (Tr. 376, 385).

Plaintiff did not seek further treatment for five months. On October 7, 2009, she presented to the Carlisle Regional Medical Center with a "mild" right knee injury (Tr. 319). She had no other complaints (Tr. 319). Plaintiff could ambulate independently, and could "perform all activities of daily living without assistance" (Tr. 321). She had no appreciable swelling of the right knee, and was able to fully extend her leg despite reports of pain (Tr. 320). Plaintiff was discharged the same day, and rated her pain as only a two out of ten, consistent with only mild discomfort (Tr. 322).

Plaintiff presented to the Chambersburg emergency room on December 1, 2009 with complaints of "general joint aching" (Tr. 373). She denied any weakness or numbness, and had no joint swelling or redness on examination (Tr. 373). Ryan Shelley, D.O., the attending physician, noted that Plaintiff "may have fibromyalgia or rheumatoid arthritis[,]" but did not perform any workup for these possible impairments (Tr. 373) (emphasis added). Dr. Shelley referred Plaintiff to her family physician and advised her to take ibuprofen (Tr. 373). The record does not contain

---

[1] Plaintiff's request for review challenges only the ALJ's findings with respect to her alleged physical impairments (Pl.'s Br. at 4). The statement of facts focuses on the disputed impairments only.

evidence of a workup for arthritis, and no evidence of the requisite 11 tender points for fibromyalgia. At a January 23, 2010 emergency room visit for dizziness, Plaintiff had normal range of motion in her joints, and no swelling, deformities, or edema (Tr. 533).

On February 18, 2010, consultative examiner David Wampler, M.D., evaluated Plaintiff in connection with her application for benefits (Tr. 434). In addition to her general reports of pain, Plaintiff related new complaints not reflected in other medical records, including an inability to do anything above shoulder level "for the last two years" and problems with her "hands curling up" (Tr. 434-35). On examination, Plaintiff had normal muscle bulk, tone, and strength, but decreased range of motion in her shoulders (Tr. 438). Despite his relatively benign examination, Dr. Wampler checked boxes to indicate that Plaintiff could never perform postural movements (Tr. 439). He also indicated that Plaintiff was generally limited in her ability to reach, but did not provide specific functional abilities (Tr. 440).

Plaintiff initiated treatment at Sadler Health on January 26, 2010 (Tr. 431-32). Treatment consisted of medication management, and progress notes do not document any functional limitations (Tr. 498-523). Although Plaintiff reported pain, she did not relate any pain in her shoulders (Tr. 513). The majority of Plaintiff's treatment in 2010 related to right knee pain. Progress notes from Appalachian Orthopedic Center reflect that Plaintiff reported difficulties only with walking, squatting, and kneeling (Tr. 104). Despite her complaints, diagnostics tests of her knee were "unremarkable" and reflected only "mild" effusion (Tr. 99, 115, 490, 527). She had full range of motion in her hips (Tr. 89, 110). "Based on the lack of significant findings" in diagnostic tests, orthopedic physician Michael Oplinger, M.D., advised Plaintiff that she was not a surgical candidate (Tr. 89, 492).

## IV.     Review of ALJ Decision

A five-step evaluation process is used to determine if a person is eligible for disability benefits. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>see also Plummer</u>, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that she is unable to engage in past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff. <u>See</u> 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

### A.     Plaintiff Allegations of Error

### 1.     ALJ Review of Medical Opinions

Plaintiff contends the ALJ erred in rejecting in part the opinion of Dr. Wampler, who performed a consulting physical examination and found that the Plaintiff had limitations in reaching.

Pl. Br. at 4, 7-9, Doc 11. The ALJ evaluated the medical opinions in conjunction with a review of the record.

### a. ALJ Review and Findings

"The claimant has the following severe impairments: Obesity, Rheumatoid Arthritis, Bipolar Disorder, Asthma, Hypertension, Depression, Anxiety Disorder, Gastroesophageal Reflux Disease, Obstructive Sleep Apnea, Status Post Bilateral Carpal Tunnel Release. 20 C.F.R. § 404.1520(c)." (Tr. 15).

"The claimant has a history of chronic knee pain and has undergone three arthroscopic surgeries. She also has a documented history of Gastroesophageal Reflux Disease and obstructive sleep apnea and hypertension. Further, the claimant . . . reported using a CPAP device in 2006." (Tr. 15).

"The claimant also has asthma, and uses a Proventil inhaler to alleviate her symptoms. As noted extensively below, the claimant has presented multiple times to local emergency departments with acute joint pain, which has been diagnosed as rheumatoid arthritis or possible fibromyalgia." (Tr. 15).

"At the hearing, the claimant's attorney noted that the claimant is 63 inches tall and weighs 278 pounds, which equals a Body Mass Index of 49.2." (Tr. 15).

"The claimant also has a history of mental difficulties, and reported in 2006 that she had been hospitalized four times at Chambersburg Hospital for psychiatric reasons. She carries a diagnosis of Bipolar Disorder II. The claimant also alleges and has testified to symptoms of Anxiety Disorder, noting that she isolates herself while at home and has difficulty interacting with others. She testified that her anxiety causes her to become physically ill. The claimant testified that her anxiety attacks

can last anywhere from five minutes to one hour in duration." (Tr. 16).

"With respect to the claimant's rheumatoid arthritis, she does not meet the listing criteria for 14.09A or 14.09D . . . the claimant's chronic joint pain . . . does not establish . . . listing 1.02. Despite the claimant's foot and knee pain,, she is able to ambulate effectively . . . She also denies use of a cane for ambulatory purposes. Further there is nothing in the medical evidence of record indicating an extreme loss of function of both extremities, as required by listing 1.02B." (Tr. 16).

"The claimant's asthma does not meet the criteria for listing 3.03 . . . There is no information contained in the medical evidence of record to indicate the claimant's breathing difficulties approach this level of severity." (Tr. 16).

"The claimant's mental impairments . . . do not meet or medically equal the criteria of listing 12.04 and 12.06. In making this finding, the [ALJ] has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 17).

"In activities of daily living, the claimant has moderate restriction. She often does not want to get out of bed, and alleges difficulty sleeping. The claimant believes that her physical impairments have led to increased depressive symptoms and mood swings. However, she prepares her own meals on a daily basis. The claimant is able to do laundry and clean dishes. She reports that she is able to

count change, handle a savings account, and use a checkbook. The claimant is able to drive a car, go into public alone, and can shop for her own groceries. The claimant alleges that since the onset of her impairments, she is still able to watch television, read, and use her computer, but must do these activities in shorter segments. <u>The claimant</u> bathes and <u>washes her hair every other day</u>." (Tr. 17-18) (emphasis added).

"In social functioning, the claimant has moderate difficulties. The consultative examiner determined that she has a moderate restriction in her ability to interact appropriately with supervisors and co-workers, and has a marked restriction in her ability to interact appropriate with the public. He also noted that the claimant would have moderate restriction in her ability to respond appropriately to changes in her routine work setting. She reports that she feels safer inside. She has some problems with handling stress, but 'can usually deal fine' with changes in her routine. The claimant alleges 'I don't go out much anymore, I stay at home.' However, she spends time with others, talks to friends on the phone, and occasionally visits her friends. She does not need anyone to accompany her in public. The claimant does not allege any difficulty getting along with family, friends, neighbors, or others. She does not allege any difficulty getting along with authority figures and has never been laid off from a job for problems getting along with others." (Tr. 18).

"With regard to concentration, persistence or pace, the claimant has moderate difficulties. The consultative examiner noted that the claimant has a slight restriction in her ability to understand and remember detailed instructions, and a moderate restriction in her ability to carry out detailed instructions. The claimant alleges some paranoid ideations. She requires encouragement to perform household chores. However, she does not allege any difficulty following written instructions. With regard to spoken instructions, the claimant 'can do without too many problems.' She does not need

to be reminded to go places. She does not allege a need for reminders to take care of her personal

needs, grooming, or to take medications." (Tr. 18).

"As for episodes of decompensation, the claimant has experienced no episodes of

decompensation, which have been of extended duration. During a 2006 evaluation for gastric bypass

surgery, the claimant noted she had four previous psychiatric hospitalizations at Chambersburg

Hospital but felt that her existing psychiatric treatment was effective." (Tr. 18).

"The limitations identified in the 'paragraph B' criteria are not a residual functional capacity

assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential

evaluation process . . . Therefore, the following residual functional capacity assessment reflects the

degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis." (Tr. 19).

"After careful consideration of the entire record, the [ALJ] finds that the claimant has the

residual functional capacity to perform less than the full range of sedentary work as defined in 20

C.F.R. § 404.1567(a) in that the claimant is limited to occasionally lifting and carrying ten pounds

and frequently lifting and carrying less than ten pounds. The claimant is limited to standing and / or

walking for 2-3 hours during an eight-hour workday and must be allowed to alternate between sitting

and standing at will. She is limited to occasional bending, climbing stairs, crouching, and exposure

to pulmonary irritants, hazards, vibrations, wetness, and humidity. She cannot perform any kneeling.

Further, the claimant is limited to understanding, remembering, and carrying out simple instructions,

exercising judgment on simple work-related matters, occasional changes to her usual work routine,

and occasional interaction with the public, co-workers, and supervisors." (Tr. 19).

"The claimant alleges disability due to a variety of mental and physical impairments. She

alleges that she only vacuums every three months because of shoulder pain. She usually naps in the

afternoon and takes pain medication several times throughout the day. She alleges that she cannot sit for very long, and must spend much of her day alternating between sitting and lying down. She alleges that she takes Tylenol PM every night in order to sleep, but wakes up throughout the night to change positions. She makes quick meals that do not require prolonged standing." (Tr. 20).

"With respect to her personal needs, <u>the claimant</u> bathes and <u>washes her hair every other day, but alleges that it 'hurts to stand in the shower' due to her physical pain</u>. The claimant alleges that she cannot lift over ten pounds and cannot squat without severe pain. She also alleges difficulty bending, standing for prolonged periods, and kneeling. The claimant alleges that she cannot stand for long periods and has difficulty walking long distances and climbing stairs. She also alleges pain and numbness in her hands. The claimant alleges that she can only walk 20 steps before needing to briefly rest. Her ability to pay attention 'depends on [the] situation around me and how much pain I'm in.'" (Tr. 20) (emphasis added).

"She alleges that most days, she stays in her pajamas and does a variety of sedentary activities, such as watching television, eating, taking her medications, and reading email. <u>The claimant alleges that [t]he shoulder pain began in 2009 and the pains throughout her body became progressively worse to the point where she now has constant pain. She alleges pain in her hands, knees, back, shoulders, feet, and hips. The claimant alleges pain when reaching overhead.</u> She alleges constant swelling of her lower extremities, which becomes worse when she is exposed to cold, dampness, rain, heat, and humidity. The claimant alleges that her physical pain varies in type and intensity." (Tr. 20) (emphasis added).

"<u>Her medications include Tylenol PM, Aleve (naproxen) and Advil (ibuprofen). She has never attended physical therapy and has not been referred to a psychologist or psychiatrist to cope with her pain</u>." (Tr. 20) (emphasis added).

"The claimant's father, David Heckman, filed a third-person function report on behalf of the claimant. He noted that the claimant is able to use the computer, naps, watches television, takes the dog outside, and feeds the cat. He also noted that the claimant eats a lot of fast food." (Tr. 20).

"David Wampler, M.D. conducted a consultative examination of the claimant on February 18, 2010. Dr. Wampler noted that the claimant had just recently received her rheumatoid arthritis diagnosis and was treating it with Mobic, a non-steroidal anti-inflammatory. Dr. Wampler reported that the claimant smokes a half-pack of cigarettes per day. He completed a medical source statement, noting that the claimant was capable of occasionally carrying and lifting up to 10 pounds, standing / walking for 1-2 hours in an eight-hour workday, and unlimited sitting." (Tr. 21).

"Dr. Wampler also noted that the claimant did not have any limitations regarding pushing and pulling with her upper and lower extremities. He found that the claimant should never engage in bending, kneeling, stooping, crouching, balancing, or climbing, and that her reaching ability was limited. Dr. Wampler further noted that the claimant is adversely affected by poor ventilation, heights, moving machinery, vibrations, dust, fumes, odors, gases, and humidity." (Tr. 21) (emphasis added).

"The claimant underwent an MRI of her right knee on September 24, 2010. Michael J. Oplinger, M.D. noted a small effusion and non-specific edema along the anterior aspect of the knee, but found no other evidence for acute abnormality or evidence of internal derangement. On September 30, 2010, Dr. Oplinger noted that because of a lack of significant findings on the claimant's MRI study, he recommended a physical therapy program. He described the degenerative joint disease findings on the MRI study 'minimal.' (Tr. 21) (emphasis added).

"Regarding the claimant's mental impairments, Christopher Royer, Ph.D. conducted a consultative psychological evaluation of the claimant on March 2, 2010. The claimant reported

having depression and 'vicious' mood swings to Dr. Royer. She stated that sometimes she does not want to get out of bed and will stay home for a week in seclusion. The claimant also reported difficulty sleeping and occasional visual hallucinations, stating that when she moves her head she feels like 'something is standing there.' Her appetite is good." (Tr. 22).

"The claimant told Dr. Royer that she takes Nexium, Benicar, Mobic, Seroquel, and Proventil. She stated that Seroquel helps with her bipolar symptoms. The claimant noted that she had thoughts of suicide during a hospitalization three years earlier, and still has occasional suicidal ideations. She told Dr. Royer that during the day, she mainly watches television and uses the computer. The claimant also said if she sees a friend, she will 'pay for it,' because of pain later." (Tr. 22).

"The claimant occasionally reads and is able to drive without difficulty, but has to stop frequently to stretch. She feels that her memory has worsened, and stated to Dr. Royer that she could not remember her friend's name." (Tr. 22).

"Dr. Royer described the claimant as 'pleasant and cooperative with the evaluation.' She ambulated independently into the examiner's room, although she appeared to be in some pain. She was fully alert and aroused, her expressive speech was fluent and goal-directed, and her thought processes were clear. Her associations were appropriate to topic and she did not express any perceptual disturbances or other gross psychopathology. Dr. Royer noted that her judgment was fair." (Tr. 22).

"The claimant performed without error on a test of mental arithmetic. She performed with one error on test of serial three addition. Her expressive speech was fluent and free of paraphasisas. She was able to follow all test instructions. Dr. Royer noted that the claimant's reasoning by analogy was within normal limits, and she demonstrated an adequate capacity for abstract conceptualization.

Her fund of information was adequate for someone of her age, education, and background." (Tr. 22).

"Dr. Royer also completed a medical source statement, noting that the claimant has marked restriction in her ability to interact appropriately with the public. He noted that the claimant has moderate restrictions in her ability to interact appropriately with co-workers and supervisors, as well as her ability to respond appropriately to work pressures and changes in a usual work setting. Dr. Royer also noted that the claimant has a moderate restriction in her ability to carry out detailed instructions." (Tr. 23).

On March 16, 2010, on behalf of the State agency, Carla Huitt, M.D. wrote a medical analysis of the claimant's pending disability claim . . . Dr. Huitt further noted that there were no examination findings or diagnostic imaging to indicate that the claimant has significant arthritis. She also noted that Dr. Wampler's examination of the claimant was 'essentially normal.' (Tr. 23) (emphasis added).

The State agency psychological consultant found that the claimant has no restriction of her activities of daily living and moderate restriction of her social functioning and concentration, persistence, or pace . . . The consultant added that the 'claimant does not receive psychiatric care nor is she engaged in therapy.' (Tr. 23) (emphasis added).

"Regarding the claimant's credibility, her allegations are simply not supported by the medical evidence of record. Despite allegations of substantial impairments, the claimant's behaviors indicate a greater ability to function than alleged when sufficiently motivated. This finding is evidenced by her recent long-distance drive to a correctional institution where her boyfriend is incarcerated, as well as occasional trips to see the auto races at the racetrack owned by her best friend. Despite allegations of substantial depression, the claimant has obtained limited treatment, no psychiatric therapy and her only medications are from her primary care physician. The claimant presented to her

local emergency department and other medical personnel frequently throughout 2010; however, rarely did those physicians find any serious impairment. The notion that the claimant tends to exaggerate her symptoms is additionally supported by Dr. Royer's finding that the claimant exhibits histrionic features." (Tr. 23-24) (emphasis added).

"The [ALJ] gives substantial weight to the examination performed by Dr. Wampler; however, his opinion regarding the claimant's limited reaching ability is given little weight because it appears to be based solely upon the claimant's subjective complaints with no supporting diagnosis elsewhere in the medical evidence of record." (Tr. 24) (emphasis added).

"The [ALJ] gives substantial weight to the findings and opinions of the State agency psychological consultant, as well as the consultative examination opinions of Dr. Royer and Dr. Wampler, with the exception of Dr. Wampler's limitation of the claimant regarding her ability to reach, which appears to be based solely upon the claimant's subjective complaints, with no supporting diagnosis in record." (Tr. 24) (emphasis added).

"The [ALJ] also gives substantial weight to the third party function report filed by the claimant's father, David Heckman, which indicates that the claimant is able to perform duties around the house such as taking out the dog, feeding the family cat, preparing some meals, and doing her own laundry." (Tr. 24).

"In sum, the above residual functional capacity assessment is supported by the consultative examination findings of Dr. Wampler and Dr. Royer, as well as the State agency psychological consultant and Dr. Huitt." (Tr. 24).

### b. Summary of ALJ Findings

Plaintiff contends the ALJ erred in rejecting in part the opinion of Dr. Wampler, who performed a consulting physical examination and found that the Plaintiff had limitations in reaching.

Pl. Br. at 4, 7-9, Doc 11.

From the review of the record, the ALJ throughly evaluated the record and found Plaintiff bathes and washes her hair every other day, but alleges that it "hurts to stand in the shower" due to her physical pain; Plaintiff alleges pain in her hands, knees, back, shoulders, feet, and hips; Plaintiff alleges pain when reaching overhead; her medications include Tylenol PM, Aleve (naproxen), and Advil (ibuprofen); she has never attended physical therapy and has not been referred to a psychologist or psychiatrist to cope with her pain; Dr. Wampler noted Plaintiff did not have any limitations regarding pushing and pulling with her upper and lower extremities; Dr. Wampler found Plaintiff should never engage in bending, kneeling, stooping, crouching, balancing, or climbing, and that her reaching ability was limited; the State agency, Carla Huitt, M.D. wrote a medical analysis of Plaintiff's pending disability claim and noted there were no examination findings or diagnostic imaging to indicate Plaintiff has significant arthritis; she also noted that Dr. Wampler's examination of the claimant was "essentially normal;" Plaintiff has obtained limited treatment, no psychiatric therapy, and her only medications are from her primary care physician; Plaintiff presented to her local emergency department and other medical personnel frequently throughout 2010, but rarely did those physicians find any serious impairment; the notion that Plaintiff tends to exaggerate her symptoms is additionally supported by Dr. Royer's finding that Plaintiff exhibits histrionic features. (Tr. 18, 20-21, 23-24).

The ALJ further gives substantial weight to the examination performed by Dr. Wampler; however, his opinion regarding Plaintiff's limited reaching ability is given little weight because it appears to be based solely upon Plaintiff's subjective complaints with no supporting diagnosis elsewhere in the medical evidence of record; gives substantial weight to the findings and opinions of the State agency psychological consultant, as well as the consultative examination opinions of Dr.

Royer and Dr. Wampler, with the exception of Dr. Wampler's limitation of Plaintiff regarding her ability to reach, which appears to be based solely upon Plaintiff's subjective complaints, with no supporting diagnosis in record; and gives substantial weight to the third party function report filed by Plaintiff's father, David Heckman, which indicates Plaintiff is able to perform duties around the house such as taking out the dog, feeding the family cat, preparing some meals, and doing her own laundry. (Tr. 24).

### c. Case Law and Analysis

Plaintiff states the ALJ gave limited weight to Dr. Wampler's opinion on her reaching restrictions but otherwise gave his findings substantial weight. Plaintiff asserts that Dr. Wampler's opinion on reaching limitations should have been given substantial weight as well as the rest of his opinion because it was based on his physical examination of the Plaintiff even if there was no objective test evidence for it. Plaintiff cites <u>Rossi v. Califono</u>, 602 F.2d 55, 58 (3rd Cir. 1979) and argues that the opinion of a treating physician need not necessarily be supported by objective findings to be entitled to substantial weight.

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(3)-(4). Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion. 20 C.F.R. § 404.1527(c)(4). A treating physician's opinion does not warrant controlling weight under the regulations unless it is well supported by clinical and laboratory diagnostic findings and consistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); <u>Plummer</u>, 186 F.3d at 429. If a treating source's opinion is not entitled to controlling weight, the factors outlined in 20 C.F.R. § 404.1527(c)(2) are used to determine the weight to give the opinion. <u>Id.</u> The more a treating source presents medical signs and

laboratory findings to support his medical opinion, the more weight it is entitled. Id. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. Id. The Commissioner is not bound by a treating physician's opinion, and may reject it, if there is a lack of clinical data supporting it, or if there is contrary medical evidence. Lyons-Timmons v. Barnhart, 147 F. App'x 313, 316 (3d Cir. 2005).

The ALJ, not the treating or examining physician, must make the disability and residual functional capacity determination. 20 C.F.R. § 404.1527(d)(1)-(2); Chandler v. Comm'r of Soc. Sec., 667 F.3d 356 (3d Cir. 2011). "The law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." Chandler, 667 F.3d at 361; Coleman v. Astrue, 2012 WL 3835403, at *2 (3d Cir. Sept. 5, 2012) (holding that ALJ may choose non-examining physician opinion over treating physician opinion as long as medical evidence not rejected for wrong reason or no reason).

The ALJ was not bound to adopt the reaching limitation from consultative examiner Dr. Wampler (Pl.'s Br. at 7-8) (Tr. 440). Contrary to Plaintiff's subjective report that she could not lift above shoulder level (Tr. 435), Plaintiff's treatment focused primarily on her right knee pain, and she did not report shoulder pain to her treating physicians or during emergency room visits (Tr. 319-20, 376, 448, 473, 475, 478, 492, 494, 500, 504, 533). Similarly, she did not report any shoulder or reaching difficulties to consultative examiner Dr. Royer, whom she saw less than one month after Dr. Wampler (Tr. 448-49). Plaintiff even confirmed on February 15, 2011 – just two months after her administrative hearing – that her primary concern was knee pain and she had "no new complaints" (Tr. 89). The record further confirms that Plaintiff had normal range of motion in all of her joints, including her arms, no swelling or deformities, full 5/5 muscle strength, and normal motor activity (Tr. 84, 470, 534). Progress notes reflect that Plaintiff could "perform all activities of daily

living without assistance" (Tr. 321). State agency physician Dr. Carla Huitt noted there were no examination findings or diagnostic tests to support Plaintiff's allegation of arthritis (Tr. 469). She also noted that Dr. Wampler's examination was "essentially normal" (Tr. 469). Plaintiff also reported that she washed her hair, which necessarily involves some overhead reaching, and contradicts her statements to Dr. Wampler that she could never perform this activity (Tr. 216).

Moreover, Dr. Wampler failed to detail any specific reaching limitations, did not identify any supportive medical findings, and appears to cite "corrective lenses" as his reason for the limitation (Tr. 440). See 20 C.F.R. § 404.1527(c)(3) (explaining that "the more a source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings" and "the better an explanation a source provides for an opinion," the more weight it will receive). An ALJ may reject generic opinions related to a plaintiff's limitations. See Bean v. Chater, 77 F.3d 1210, 1214 (10th Cir. 1995) (finding that a general limitation that "d[id] not indicate exactly what plaintiff can do" in relation to the requirements of physical or mental work activities). There was no need to incorporate the reaching limitation into Plaintiff's work capacity assessment.

In sum, the objective evidence, including Plaintiff's lack of treatment for her shoulder, full muscle strength, and normal range of motion does not support a reaching limitation. And even if Plaintiff were limited in her ability to reach overhead, the vocational expert confirmed that a limitation to occasional overhead reaching "would not negatively impact [Plaintiff's] ability to perform" the identified jobs (Tr. 74).[2] Thus, even if Plaintiff were limited in her ability to reach

---

[2] The Dictionary of Occupational Titles (DOT) does not describe all of the functional demands of an occupation, such as overhead reaching as opposed to reaching in all directions. Because the DOT is silent on overhead reaching, the ALJ was permitted to rely on this testimony from the vocational expert. See Shears v. Barnhart, 2006 WL 1641635, *2 (E.D. Pa. 2006) (the DOT is "merely a starting place from which to assess

overhead, she could still perform the jobs identified by the vocational expert.

The case law in this circuit makes clear that physician opinions are not binding upon an ALJ, and that an ALJ is free to reject a medical source's conclusions. Chandler, 667 F.3d 356 at 361. In so doing, however, the ALJ must indicate why evidence was rejected, so that a reviewing court can determine whether "significant probative evidence was not credited or simply ignored." Cotter v. Harris, 642 F.2d 700, 705 (3d Cir.1981). Mistick v. Colvin, No. 12-cv-1031, 2013 WL 5288261 (W.D. Pa. Sept. 18, 2013).

In Chandler, 667 F.3d at 362, the Third Circuit held that the district court had erred in concluding that the "ALJ had reached its decision based on its own improper lay opinion regarding medical evidence." Id. "The ALJ– not treating or examining physicians or State agency consultants –must make the ultimate disability and RFC determinations." Id. at 361 (citing 20 C.F.R. 404.1527(e)(1), 404.1546(c)).

The burden lies with Plaintiff to demonstrate harm from such error that would have changed the ALJ's decision, but she has not done so here. Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009); see also Molina v. Astrue, 674 F.3d 1104, 1111, 1115-22 (9th Cir. 2012). "No principle of administrative law 'requires that we convert judicial review of agency action into a ping-pong game' in search of the perfect decision." Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)); see also Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result").

---

job definitions."); Zblewski v. Astrue, 302 Fed. App'x 488, 492 (7th Cir. 2008) (ALJ properly relied on VE's testimony where the DOT did not address a particular subject).

**2.      ALJ Residual Functional Capacity Finding and Question to Vocational Expert**

Plaintiff contends the ALJ erred in determining Plaintiff's residual functional capacity and question to the vocational expert by failing to include the reaching and postural limitations of bending, kneeling, stooping, crouching, balancing, or climbing found by Dr. Wampler. (Tr. 440). Plaintiff states the ALJ failed to explain how he gave Dr. Wampler's opinion precluding postural movements substantial weight without including it in the hypothetical to the Vocational Expert. Pl. Br. at 4, 9-10, Doc. 11.

"Plaintiff next argues that the hypothetical to the ALJ was critically deficient, in that it failed to acknowledge plaintiff's restrictions to handle and work with small objects with both hands, and also failed to acknowledge that medications that plaintiff was using would prevent him from working. In view of the scarcity of medical evidence regarding plaintiff's dextral limitations, the ALJ did not err in omitting such limitations from the hypothetical question. See Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) ('We do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant . . . the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations')." Clark v. Astrue, 844 F. Supp. 2d 532, 547 (D. Del. Feb. 15, 2012).

"[T]he ALJ is not bound to accept every limitation that is found by a medical professional, but rather only the ones that she finds are credibly established by the record. See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 147 (3d Cir. 2007). Contrary to Plaintiff's assertion, the ALJ did not err by incorporating into her RFC finding only those limitations which she found to be credibly established by the objective medical evidence and the Court finds that the ALJ's RFC determination as well as her ensuing hypothetical to the vocational expert both enjoy the support of substantial record evidence. Finally, the Court finds that the ALJ evaluated the medical opinion evidence

properly and in accordance with the applicable rules and regulations and that substantial record evidence supports her evaluation. The ALJ gave a detailed explanation for why the medical source statements from the mental health providers were not given controlling weight the ALJ discussed at length her justification for why the medical source statements from Dr. Jahangeer and Ms. Walker were inconsistent with and contradicted by the other medical evidence of record, including their own notes and prior findings. The Court finds that the ALJ discharged her duty because she (i) demonstrated her consideration of all the relevant medical evidence, (ii) addressed the contradictory evidence in the record which conflicted with her findings, and (iii) explained why that contrary evidence was rejected or not given controlling weight. See Cotter, 642 F.2d at 705. Indeed, the overarching theme of the ALJ's decision was the complete lack of objective medical evidence which corroborated or even tended to support Plaintiff's complaints of severely disabling impairments and the Court agrees with the ALJ's finding that such corroborating evidence was woefully lacking in the record. Plaintiff's subjective complaints were corroborated only by her own self-reports, which—for the reasons discussed by the ALJ—were not particularly credible. To that end, the Court finds that the ALJ's credibility determination is well-supported by the record and that Plaintiff's arguments to the contrary are completely unpersuasive, particularly given the minimal treatment record, the inconsistencies in the record that were highlighted and discussed by the ALJ . . . Accordingly, the Court concludes that substantial record evidence supports the ALJ's determination of non-disability." Stewart v. Astrue, No. 13–73, 2014 WL 29035, at *1, n.1 (W.D. Pa. Jan. 2, 2014).

Similarly in this case, the record does not support Plaintiff's assertions of disabling severity. Plaintiff's contentions of error are inconsistent with the objective evidence and activities of daily living. From the ALJ's extensive review, substantial evidence supports the weight accorded to the allegations and opinions of record.

Thus, the ALJ's RFC finding includes only "credibly established limitations" and not all impairments alleged by claimant, <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005). Accordingly, the ALJ relied on the record and testimony in determining Plaintiff's residual functional capacity, and the findings are supported by substantial evidence.

### a. Question to Vocational Expert

Plaintiff contends the ALJ's hypothetical question to the Vocational Expert ("VE") did not include all of Plaintiff's limitations. Pl. Br. at 4, 9-10, Doc. 11.

At the administrative hearing, the ALJ asked the VE whether jobs existed for a person of Plaintiff's age, education, and work experience, who could perform less than the full range of sedentary work and was capable of occasionally lifting and carrying ten pounds and frequently lifting and carrying less than ten pounds, limited to standing and / or walking two to three hours during an eight hour work day with the option to sit or stand at will, occasionally bend, climb stairs, crouch and be exposed to pulmonary irritants, hazards, vibrations, wetness and humidity (Tr. 70). In addition the Plaintiff could not kneel and would be limited to understanding, remembering and carrying out only simple instructions, exercising judgment on simple work related matters with occasional changes to a usual work routine and occasional interaction with the public, coworkers and supervisors (Tr. 70). With those limitations, the Vocational Expert testified that the Plaintiff would not be able to perform her past relevant work but would be able to do work as a Final Assembler (Tr. 71), Table Worker, or Label Pinker (Tr. 72).

The ALJ was not bound by Dr. Wampler's opinion that Plaintiff could not perform any postural activities (Tr. 440). Plaintiff has not identified any objective evidence to support such a finding but merely checked boxes that Plaintiff could never perform these activities (Tr. 440). <u>See</u> 20 C.F.R. § 404.1527(c)(3). "Form reports in which a physician's obligation is only to check a box

or fill in a blank are weak evidence at best." <u>Mason</u>, 994 F.2d at 1065.

Plaintiff states in her reply (Pl. Reply at 4, Doc. 15) she cannot afford / obtain a functional capacity evaluation, but the record still lacks regular consistent treatment to support the limitations urged by Plaintiff in the residual functional capacity.

The regulations require the ALJ to find that Plaintiff's disability is expected to last continuously for a year. To receive disability or supplemental security benefits, Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last <u>for a continuous period of not less than 12 months</u>." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A) (emphasis added). Thus, Plaintiff's impairments and inability to do activities must also meet the durational requirement.

Dr. Wampler's examination was rather benign; Plaintiff had full muscle strength, and normal range of motion in all her joints. Although she reported right knee pain, diagnostic tests showed only "mild" effusion, no other evidence of abnormality, and her knee was generally "unremarkable" (Tr. 99, 115, 490, 497). She had normal sensation, no calf tenderness or signs of deep vein thrombosis, and essentially normal range of motion in her legs (Tr. 89, 103, 494, 533).[3] These objective findings do not support such restrictive limitations.

The record also confirms that Plaintiff performed postural movements. Progress notes reflect that Plaintiff could "perform all activities of daily living without assistance" (Tr. 321). Plaintiff admitted that she "dr[ove] without too much difficulty[,]" which requires postural movements to

---

[3] Treating orthopedist Dr. Oplinger noted that when Plaintiff's range of motion was slightly reduced to 110 degrees, this was due to the size of Plaintiff's leg rather than pain (Tr. 89). He did not feel that Plaintiff warranted surgical intervention, and instead recommended weight loss (Tr. 89).

enter and exit the vehicle (Tr. 37, 230, 449). She did not require an assistive device to walk, which confirms she could sufficiently balance (Tr. 234). Thus, the record did not support a finding that Plaintiff could "never" perform postural activities. Furthermore, the ALJ included a limitation to avoid kneeling, and the vocational expert also confirmed that postural activities such as bending, stooping, and climbing "would not really impact sedentary work" (Tr. 75).

To the extent Plaintiff suggests that the ALJ gave substantial weight to Dr. Wampler's examination (Pl.'s Br. at 9), even when an ALJ gives considerable weight to an opinion, he is not required to adopt an opinion wholesale and include every degree of limitation in the RFC. See, e.g., Lambert-Newsome v. Astrue, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012) (noting the ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale."); Woodrome v. Astrue, 2012 WL 1657216, at *3 (W.D. Mo. May 10, 2012) (noting the ALJ did not adopt opinion by giving it great weight).

### b. Jobs Proposed by Vocational Expert

Plaintiff argues the jobs proposed by the VE (Final Assembler, Table Worker, or Label Pinker) require frequent reaching. Pl. Br. at 9, Doc. 11; Pl. Reply at 1, Doc. 15.

"The Court does not find any error with the ALJ accepting the VE's testimony regarding the number of . . . jobs that are available in the national and local level. Social Security Regulations explain that: 'When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—(1) Dictionary of Occupational Titles, published by the Department of Labor; (2) County Business Patterns, published by the Bureau of the Census; (3) Census Reports, also published by the Bureau of the Census; (4)

Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics. 20 C.F.R. § 404.1566(d).'" McKinnon v. Commissioner of Social Sec., No. 12–4717, 2013 WL 5410696, at *5 (D. N.J. Sept. 26, 2013).

From a review of case law, it appears these jobs could be performed by plaintiffs with reaching restrictions.

"The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to lifting ten pounds occasionally and two to three pounds frequently, who could stand or walk for one hour and sit for eight hours, and could not use the left lower extremity for pushing. The hypothetical individual could engage in occasional postural maneuvers, was limited in using the left arm for reaching occasionally, could not do work requiring her to flex the left elbow to its full extent more than 50% of the time, was right hand dominant, and must avoid poor ventilation, vibration, temperature extremes, wetness, dust and humidity. (R. at 54). The hypothetical individual was further limited to simple, routine, repetitive tasks, not fast paced, with only incidental interaction with co-workers and the public, and interaction with a supervisor for 1/6 of the time. The vocational expert testified that such an individual could perform the jobs of a surveillance system monitor, assembler, and laborer." Tirpak v. Colvin, No. 13-cv-143, 2014 WL 709977, at *7 (W.D. Pa. Feb. 25, 2014) (emphasis added).

"During the supplemental hearing in 2010, the ALJ posed the following hypothetical to . . . a vocational expert: [A]ssume an individual the same age, educational level, work history as [Plaintiff] who at all times during the period of consideration would be capable of performing at best sedentary level work set forth in a stable work environment not subject to any more than occasional work setting changes. The individual would be able to perform the general requirements for

sedentary work as described in the Dictionary of Occupational Titles except that the individual

would require a self-directed sit / stand option. I would also indicate that from a postural standpoint,

the individual should be able to at most be able to accomplish stooping and crouching and kneeling

on an occasional basis . . . climbing of ladders or scaffolds or ropes to emergent and ramps or stairs

to occasional and the individual would have the exertional capacity to utilize the upper extremities

without restriction except with respect to the body posturing of the neck the individual should not

be required to place the neck in a forward flex position for continuous periods of time without the

opportunity for relaxation of that forward flex position . . . The individual would be able to perform

the activities required, again with the upper extremities without restriction as far as handling,

fingering, feeling, grasping. I would restrict overhead reaching to occasional. In terms of the work

setting the work should be of an unskilled nature. Essentially simple[,] routine work tasks . . . Based

on the hypothetical [the vocational expert] provided the following testimony regarding available

occupations in the northeast Pennsylvania region: An assembler, small products sedentary, unskilled

SVP of 2, approximately 1,500 to 1,600 . . . a sorter and this is clerical . . . sedentary, unskilled, SVP

of 2. The numbers [are] 500 to 600 and . . . general cashier also known as a cashier II in the DOT

. . . sedentary, unskilled, SVP of 2 and that's approximately 1,700, 1,800." Webber v. Colvin, No.

12–CV–2558, 2014 WL 29010, at *5-6 (M.D. Pa. Jan. 2, 2014) (emphasis added).

"[T]he claimant has the residual functional capacity to perform sedentary work as defined

in 20 CFR 416.967(a) except lift and carry up to 10 pounds occasionally and less than 10 pounds

frequently, stand and/or walk at least 2/8 hours with normal periods of rest, using a cane for short

and long distances, sit about 6/8 hours, occasional ramp, stair, ladder, rope and scaffold climbing,

occasional balancing, stooping, kneeling, crouching and crawling, occasionally reaching over the

level of the shoulder joints and no concentrated exposure to fumes, odors, dusts, gasses and poor

ventilation. With this residual functional capacity, the ALJ concluded that Plaintiff was 'unable to perform any past relevant work,' but retained the ability to perform 'jobs that exist in significant numbers in the national economy,' such as table worker, film touch up inspector, and assembler. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act." Jefferson v. Colvin, 1:13–cv–00704–JLT, 2014 WL 4275516, at *6 (E.D. Cal. Aug. 29, 2014) (emphasis added).

The ALJ posed the following hypothetical to the VE: Assume that we have an individual that . . . is currently 47 and has . . . no past relevant work experience . . . Assume that this individual . . . is limited to sedentary work, can lift and carry no more than 10 pounds occasionally, can stand and walk no more than two out of eight hours and sit for at least six out of eight hours, that she should not operate foot controls with her lower extremities, that she can perform the postural activities occasionally but never climb ladders, ropes or scaffolds. She can only occasionally reach overhead and she should avoid concentrated exposure to work hazards. The VE testified that such an individual could perform the following unskilled work: general office clerk (2,100 jobs locally, 10,000 statewide, 207,000 nationally); order clerk (1,800 jobs locally, 9,000 statewide, 200,000 nationally); and, table worker (5,000 jobs locally, 27,000 statewide, 473,000 nationally). (Tr. 50.) The VE further testified that the need to use a cane to ambulate would not substantially affect these jobs, as they are performed at the sedentary level." Thurman v. Commissioner of Social Sec., No. 1:12–cv–2034, 2013 WL 2358579, at *2 (N.D. Ohio May 29, 2013) (emphasis added).

"[T]he ALJ's lengthy discussion of Plaintiff's overall medical history and her related treatments, indicated that despite Plaintiff's back condition, she retained some functional use of her back and extremities. Additionally, Plaintiff testified at the hearing that she could lift about 10 pounds, sit or stand for about 35 to 40 minutes, and could walk for about 20 minutes. She also

testified that she has a driver's license and drives to medical appointments or the grocery store, she can cook microwave dinners, can wash a few dishes, and can do small loads of laundry . . . At Plaintiff's hearing, the ALJ explicitly asked the VE to consider an individual having the same age, education, and work experience as Plaintiff who has an RFC to perform the full range of <u>sedentary work</u> with the following limitations: limited to simple tasks, change positions briefly every 40 minutes, should have only occasional contact with coworkers and the general public. The VE testified that such an individual could perform the occupations of brake linings coder and <u>label pinker</u>. Because the hypothetical question posed to the VE was based on an RFC that accurately described Plaintiff's limitations, the VE's testimony provides substantial evidence to support the ALJ's finding of no disability." <u>Ortiz v. Colvin</u>, No. 13–CV–6463, 2014 WL 3784108, at *8, *11 (W.D. N.Y. July 31, 2014) (emphasis added).

"[T]he ALJ assessed plaintiff's RFC and determined she can perform light work. The ALJ further found plaintiff can 'lift/carry 10 pounds frequently and 20 pounds occasionally; no limitation sitting; stand/walk 6 hours/8 hour workday; no repetitive forceful gripping; frequent gross manipulation with right upper extremity; occasional fine fingering with right upper extremity; and, <u>no constant overhead reaching</u>' . . . the ALJ elicited testimony from the VE that plaintiff can perform the positions of <u>label pinker</u>, DOT 585.685–062, and escort-vehicle driver, DOT 919.663–022. Both the <u>label pinker</u> and escort-vehicle driver positions require only a strength level of <u>sedentary work</u> and 'occasional' walking and standing (up to 2.67 hours out of an 8 hour workday). <u>See</u> DOT 585.685–062, 1991 WL 684400 (description of 'label pinker' position and defining occasional as any 'activity or condition [that] exists up to 1/3 of the time') . . . 20 C.F.R. 416.967(a) ('Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.'). Thus, any error committed by the ALJ in her Step Four determination is harmless as the outcome

would have been the same. See Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006) (holding that harmless errors are those that are inconsequential to the ultimate non-disability determination); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ('A decision of the ALJ will not be reversed for errors that are harmless.'"). Barba v. Colvin, No. 12–10674, 2014 WL 1630686, at *3 (C.D. Cal. Apr. 23, 2014).

Since the VE identified a significant number of unskilled, sedentary jobs in the national economy that could be performed by a hypothetical individual with the same vocational profile and RFC as Plaintiff, substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled under the Act. See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (which provides that the testimony of a VE constitutes substantial evidence for purposes of judicial review where the hypothetical questioning of the ALJ fairly encompasses an individual's significant limitations that are supported by the record).

"Because the hypothetical posed to the vocational expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. See Covone v. Commissioner Social Sec., 142 Fed. Appx. 585, 2005 WL 1799366 (3d. Cir. July 29, 2005). As the ALJ's decision is supported by the testimony of the vocational expert, the decision is supported by substantial evidence and is, therefore, affirmed. See Plummer, 186 F.3d at 431." Robinson v. Astrue, No. 10–1568, 2011 WL 1485977, at *13 (W.D. Pa. Apr. 19, 2011).

Accordingly, substantial evidence supports the ALJ's hypothetical question, which included the limitations supported by the record.

### 3.      ALJ's Credibility Determination

Plaintiff contends the ALJ erred by discounting her credibility. Pl. Br. at 4, 10-11, Doc 11. The ALJ reviewed the record to evaluate Plaintiff's credibility.

When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. SSR 96–7p, 61 Fed. Reg. 34483 (July 2, 1996). In particular, an ALJ should consider the following factors: (1) the plaintiff's daily activities; (2) the duration, frequency and intensity of the plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's prior work record; and (8) the plaintiff's demeanor during the hearing. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); Jury v. Colvin, No. 3:12-cv-2002, 2014 WL 1028439 (M.D. Pa. Mar. 14, 2014). When the Court reviews  the ALJ's decision, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." Walters v. Commissioner of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citing Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir.1991) ("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.")). Furthermore, in determining if the ALJ's decision is supported by substantial evidence the court may not parse the record but rather must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The ALJ provided the reasons for discounting Plaintiff's credibility. "Regarding the claimant's credibility, her allegations are simply not supported by the medical evidence of record. Despite allegations of substantial impairments, the claimant's behaviors indicate a greater ability to function than alleged when sufficiently motivated. This finding is evidenced by her recent long-distance drive to a correctional institution where her boyfriend is incarcerated, as well as

occasional trips to see the auto races at the racetrack owned by her best friend. Despite allegations of substantial depression, the claimant has obtained limited treatment, no psychiatric therapy and her only medications are from her primary care physician. The claimant presented to her local emergency department and other medical personnel frequently throughout 2010; however, rarely did those physicians find any serious impairment. The notion that the claimant tends to exaggerate her symptoms is additionally supported by Dr. Royer's finding that the claimant exhibits histrionic features." (Tr. 23-24).

Plaintiff challenges the credibility assessment that the ALJ should have accepted her allegations she could never reach overhead or perform postural movements (Pl.'s Br. at 10). Plaintiff does not identify any objective findings to support her claim, and it is well settled that subjective statements alone are not enough to establish functional limitations. See 20 C.F.R. § 404.1528(a); see also Young v. Comm'r of Soc. Sec., 322 Fed. Appx. 189, 191 (3d Cir. 2009) (finding the claimant failed to support his symptoms with objective medical evidence from the record). Plaintiff's lack of treatment for a shoulder condition undermines her claim of significant reaching limitations. See 20 C.F.R. § 404.1529(c)(4), and Social Security Ruling (SSR) 96-7p (stating that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"). See also Bayhurst v. Astrue, 2008 WL 5158266, at *9 (W.D. Pa. 2008) (an ALJ is "required to consider' as a factor in assessing Plaintiff's credibility the extent of treatment); Mason, 994 F.2d at 1068 ("We do not quarrel with the ALJ's entitlement to draw an inference adverse to appellant from the fact that appellant has not sought medical assistance to relieve his professed [disabling symptoms]").

Although the ALJ found that Plaintiff was not disabled under the Act, he nevertheless gave due weight to Plaintiff's subjective statements because he limited her to work at a significantly lower

level than previously performed (Tr. 24). See e.g. Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986) (holding that an ALJ's finding that a claimant can do work only at a level significantly lower than in the past constitutes an implicit acceptance of her complaints and accords them appropriate weight). Indeed, "a claimant's inability to work pain-free, standing alone, is not sufficient reason to find her disabled." Qantu v. Barnhart, 72 F. App'x 807, 811 (10th Cir. 2003). "Pain is not disabling per se, and subjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." Parris v. Heckler, 733 F.2d 324, 327 (4th Cir. 1984). As set forth above, the record did not support the degree of alleged limitations.

In Plaintiff's reply, she argues there were medical records to support disability. Pl. Reply at 1, Doc. 15. However, the ALJ had substantial evidence for the decision, i.e., more than a scintilla, which is the standard on appeal. Plummer, 186 F.3d at 427.

Thus, the ALJ's decision was consistent with the medical evidence in the record and Plaintiff's testimony at the ALJ hearing. Accordingly, substantial evidence supports the ALJ's findings regarding Plaintiff's credibility.

## V.    Conclusion

Therefore, the Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1382c; Brown, 845 F.2d at 1213; Johnson, 529 F.3d at 200; Pierce, 487 U.S. at 552; Hartranft, 181 F.3d at 360; Plummer, 186 F.3d at 427; Jones, 364 F.3d at 503.

Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla of evidence. It does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson

v. Perales, 402 U.S. 389, 401 (1971).

Thus, if a reasonable mind might accept the relevant evidence as adequate to support the conclusion reached by the Acting Commissioner, then the Acting Commissioner's determination is supported by substantial evidence and stands. Monsour Med. Ctr., 806 F.2d at 1190. Here, a reasonable mind might accept the evidence as adequate, and the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate order in accordance with this memorandum to deny Plaintiff's appeal will follow.

Dated: September 24, 2014                          s/Gerald B. Cohn
                                        GERALD B. COHN
                                        UNITED STATES MAGISTRATE JUDGE